UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRIAN BAUDE                          )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )        Case No.  4:18-CV-1564-RWS
                                     )
CITY OF ST. LOUIS, et al.,           )
                                     )
        Defendants.                  )

## MEMORANDUM AND ORDER

This matter is before me on Defendants' Motion for Judgment on the

Pleadings pursuant to Fed. R. Civ. P. 12(c). Plaintiff Brian Baude brings a series of

claims under 42 U.S.C. §1983 alleging violations of his First, Fourth, and

Fourteenth Amendment rights, as well as supplemental state law claims, against

several St. Louis Metropolitan Police Department ("SLMPD") Officers and the

City of St. Louis (the "City") for their actions during the protests following the

verdict in State of Missouri v. Stockley.[1] Baude claims that he was illegally

"kettled,"[2] sprayed with pepper spray without warning, and arrested while

observing and documenting the protest on September 17, 2017. This is one of

---

[1] State v. Stockley, No. 16220CR02213-01 (Mo. 22nd. Jud. Cir. Sep. 15, 2017).
[2] According to the complaint, "kettling" is a law enforcement tactic by which officers encircle a group of protestors without providing a means of egress. [ECF No. 34 at 11-13].

several cases arising out of the protest activity following the <u>Stockley</u> verdict.[3]

## BACKGROUND

Plaintiff Baude filed this action on September 17, 2018 and filed his first amended complaint on January 9, 2019. On February 15, 2019, he filed his second amended complaint asserting the following claims under 42 U.S.C. §1983: that the individual defendants violated Baude's First and Fourteenth Amendment rights to freedom of speech and assembly (Count 2), that the individual defendants violated his Fourth and Fourteenth Amendment rights to freedom from unreasonable seizure (Count 1) and freedom from excessive use of force (Count 12), that the city and the individual defendants conspired to deprive him of his civil rights (Count 3), and that the City is liable under <u>Monell</u>[4] because the violations of his civil rights were caused by a policy, practice or custom of the City and by its failure to train, discipline or supervise its police officers (Count 4). Baude also brings a number of supplemental state law claims for false arrest, false imprisonment, abuse of process, malicious prosecution, intentional infliction of emotional distress, or alternatively negligent infliction of emotional distress, and battery (Counts 5-11 and 13).

---

[3] *See* <u>Aldridge v. City of St. Louis, MO,</u> No. 4:18-CV-1677-CAS, 2019 WL 1695982 (E.D.MO. April 17, 2019); <u>Laird v. City of St. Louis, MO,</u> No. 4:18-CV-1567-AGF, (E.D.MO June 27, 2019); <u>Laney v. City of St. Louis,</u> No. 4:18-CV-1575-CDP, 2019 WL 2423308 (E.D.MO June 10, 2019).
[4] <u>Monell v. Department of Soc. Servs. of City of New York,</u> 436 U.S. 658 (1978).

Defendants' moved to dismiss the second amended complaint in its entirety under Fed. R. Civ. P. 8(a) and Fed. R. Civ. P. 12(b)(6) on December 19, 2018. I denied the Defendants' motion except as to municipal liability under the failure to train or supervise theory.  The individual Defendants' now bring a motion for judgment on the pleadings arguing they are entitled to qualified immunity for the §1983 claims in Counts I, II, III, and XII.

## STATEMENT OF FACTS

The Circuit Court of the City of St. Louis issued its findings and verdict in Stockley on September 15, 2017, prompting protests in the St. Louis metropolitan area. The protests lasted throughout the weekend of September 15, 2017 and into the following week. Although the Stockley verdict prompted the protests, they addressed broader issues, including racism and the use of force by local police and law enforcement. Based on the complaint and construing it in the light most favorable to the plaintiff, the following events occurred.

On Sunday, September 17, 2017, there were peaceful protests in the downtown St. Louis area during the day and early evening. Around 8:00 pm there were reports of property being damaged on Olive and Locust streets east of Tucker Blvd. In response to these reports tactical teams were sent to investigate. The tactical units encountered a group of protesters near Olive and Tucker. The protesters were coming from the area where property damage had been reported

3

and several of the protesters donned goggles and masks. Around 8:45 pm, the tactical unit declared the gathering unlawful and Sargent Rossomanno made an announcement directing the crowd that the assembly had been declared unlawful and they must disperse or risk arrest or the use of chemical munitions. The order did not specify how far the crowded needed to go to comply with the order. After the initial order was given protesters remained, so SLMPD deployed chemical munitions. At that time, most of the crowd dispersed, although several protesters were arrested. No other reports of property damage or violence occurred after this time period.

After the crowd dispersed, the tactical teams were sent back to their staging areas. At this point officers were not limiting ingress or egress from the area. Eventually another crowd of 50-100 people began to form near the intersection of Washington Ave and Tucker Blvd, several blocks from where the earlier events had occurred. The incident commander, Lt. Col. Leyshock, determined that anyone remaining in the downtown area should be arrested and issued orders for the assembly to be declared unlawful and dispersed. This decision was made around 10:00 pm. Defendants state that numerous dispersal warnings were given from the time this decision was made until the final dispersal order was given by Lt. Col. Leyshock around 11:00 pm.  But the parties dispute whether, and to what extent, additional unlawful assembly/dispersal warnings were given after the initial

4

dispersal order was given at Olive and Tucker and before the 11:30 p.m. mass arrest at Washington and Tucker.

Plaintiff Brian Baude, a resident of St. Louis, lives approximately three blocks from the intersection of Washington Ave and Tucker Blvd. On the night of September 17, 2017, he was at his home when he learned on social media that protesters were allegedly destroying property nearby. Baude decided to investigate and document damage and protest related activity in his neighborhood. He left his home around 9:30 pm, which unbeknownst to him was approximately forty-five (45) minutes after the SLMPD declared the gathering unlawful and issued dispersal orders to people gathered near Olive Street and Tucker Blvd.

After leaving his home Baude walked past the St. Louis Public Library, where he saw a group of police officers on bikes in what appeared to him to be a staging area. He then continued to walk east on Olive, where he saw and documented broken flowerpots and other damage between 9th and 10th Streets. Baude then headed back toward his home, walking west on Washington Ave. When he approached Tucker Blvd, he saw a small group of people gathered near the intersection and a line of police officers assembled on Tucker near Lucas Ave. Baude turned south on Tucker Blvd and walked toward Locust Street where he encountered another group of people and a line of police officers. Shortly after arriving, Baude heard SLMPD make an announcement instructing everyone at the

5

intersection to leave the area by walking west on Locust Street and North on Tucker Blvd.  Baude followed this instruction and walked north on Tucker until he reached Washington Ave. The police officers stationed at Locust followed the dispersing crowed and advanced north on Tucker holding a position at St. Charles Street.

According to Baude, approximately forty-five (45) minutes elapsed during which time he heard no additional dispersal orders. Baude then noticed lines of police on Washington Ave to the west and east of the intersection. These lines began to converge on the crowd, confining them to the intersection of Washington and Tucker, a tactic Plaintiff refers to as "kettling." At this point Baude asked a police officer how to leave the area and was told it was too late. He approached another officer to ask if there was anything he could be doing to help, and the officer grabbed him and threw him back into the intersection. Baude was then sprayed in the back and right side with pepper spray. He was given no warning chemical munitions would be deployed. Other officers also indiscriminately sprayed compliant and peaceful citizens in the intersection. Baude believes the officers were targeting individuals recording the events. The SLMPD then arrested Baude, zip-tied his hands, and lined him up with others against a building on Tucker. Baude was taken to the City Justice Center, where he was subject to a search and held for fourteen hours in an overcrowded cell. Baude was given a court

6

date, which was later cancelled. Since then he has received no further information about outstanding charges against him.

Baude claims that the events of September 17, 2017, had a chilling effect on his expressive activity and that he no longer records incidents involving police and protestors. Baude also claims he suffered anxiety because he feared he may lose his job and felt a profound sense of injustice. Additionally, as an officer in the Air National Guard, Baude had to report the incident immediately to his supervisors and during his security clearance renewal process.

In addition to the factual allegations regarding the protests on the night of September 17, 2017, the complaint also details other allegations of SLMPD's use of chemical agents against protestors without warning, use of excessive force, and the history of litigation against the City for these types of incidents.

## LEGAL STANDARD

When considering a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), I must "accept as true all factual allegations set out in the complaint and must construe the complaint in the light most favorable to the plaintiff, drawing all inferences in his favor." Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law[.]" Ashley Cty., Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir.

2009) (internal quotation marks and citation omitted).

I review a motion for judgment on the pleadings under the same standard as a Fed. R. Civ. P. 12(b)(6) motion to dismiss. See Clemons v. Crawford, 585 F.3d 1119, 1124 (8th Cir. 2009). Therefore, I consider all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see also Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Although a complaint need not contain "detailed factual allegations," it must contain sufficient factual allegations "to raise a right to relief beyond the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

In addition to the complaint, I may consider exhibits that are attached to the complaint as well as materials necessarily embraced by the complaint, without having to convert the motion to one for summary judgment. Humphrey v. Eureka Gardens Pub. Facility Bd., 891 F.3d 1079, 1081 (8th Cir. 2018); Ryan v. Ryan, 889 F.3d 499, 505 (8th Cir. 2018). Materials necessarily embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the

pleading." Ryan, 889 F.3d at 505 (internal quotation marks and citations omitted).

Accordingly, on this motion for judgment on the pleadings, I consider the

allegations in the complaint and the exhibits attached to it.

## DISCUSSION

"Qualified immunity shields a government official from suit under § 1983 if

his 'conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'" Kelsay v. Ernst, 933 F.3d 975,

979 (8th Cir. 2019) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct.

2727, 73 L.Ed.2d 396 (1982)). When a defendant invokes a claim of qualified

immunity, the burden falls on the plaintiff to show: "(1) the facts, viewed in the

light most favorable to the plaintiff[ ], demonstrate the deprivation of a

constitutional right; and (2) the right was clearly established at the time of the

deprivation." Snider v. City of Cape Girardeau, 752 F.3d 1149, 1155 (8th Cir.

2014) (quoting Baribeau v. City of Minneapolis, 596 F.3d 465, 474 (8th Cir.

2010)). Therefore, in order to determine whether a defendant is entitled to qualified

immunity, the Court must determine whether the alleged facts demonstrate that his

conduct violated a constitutional right and, whether that right was clearly

established at the time of the alleged injury. Howard v. Kan. City Police Dep't, 570

F.3d 984, 988 (8th Cir. 2009). "If the answer to either question is no," then the

defendant is entitled to qualified immunity. Doe v. Flaherty, 623 F.3d 577, 583

(8th Cir. 2010).

## A.      Counts One and Two – Unlawful Seizure

Plaintiff alleges his kettling and arrest were unlawful seizures in violation of his First and Fourth Amendment rights. Defendants argue they had probable cause to arrest him and therefore, should be entitled to qualified immunity.

"A warrantless arrest does not violate 'the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" White v. Jackson, 865 F.3d. 1064, 1074 (8th Cir. 2017) (quoting Borgman v. Kedley, 646 F.3d 518, 522-23 (8th Cir. 2011). Probable cause exists when the totality of facts known at the time of the arrest would justify a reasonable person in believing that the individual has committed or is committing an offense. Ehlers v. City of Rapid City, 846 F.3d 1002, 1009 (8th Cir. 2017). "Arguable probable cause exists even whe[n] an officer mistakenly arrests a suspect believing [the arrest] is based in probable cause if the mistake is objectively reasonable." Id. (internal quotation marks omitted) (quoting Borgman, 646 F.3d at 523); see also Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005) ("[S]o long as he is reasonable, the governing standard for a Fourth Amendment unlawful arrest claim 'is not probable cause in fact but arguable probable cause ... that is, whether the officer should have known that the arrest violated plaintiff's clearly established right.' " (quoting Habiger v. City of Fargo,

80 F.3d 289, 295 (8th Cir. 1996))).  The fact that the person arrested is later found innocent is not material. Linn v. Garcia, 531 F.2d 855, 861 (8th Cir.1976). Whether a law enforcement officer had probable cause at the time of arrest is a question of law. Fisher, 619 F.3d at 816.

The Eighth Circuit considered Fourth Amendment challenges to mass arrests in Bernini v. City of St. Paul and affirmed the principle that "the Fourth Amendment 'is satisfied if the officers have grounds to believe all arrested persons were part of the *unit* observed violating the law." Bernini v. City of St. Paul, 665 F.3d 997, 1003 (8th Cir. 2012) (quoting Carr v. District of Columbia, 587 F.3d 401, 408 (D.C. Cir. 2009)).  The case arose out of the 2008 Republican National Convention. Safety concerns caused the City of St. Paul to close the downtown area near the convention. Id. A group of protestors marching and chanting in unison defied the order, attempted to enter the closed part of downtown, and were redirected by lines of police officers to a park outside the closed area. Id. At the park the officers recognized that the crowd included individuals who had not been present during the initial confrontation.  The officers proceeded to ascertain and arrest only those individuals who were at the earlier confrontation.  As a result of this process about half of the group at the park was released. Id. at 1002.  The fact that the police attempted to discern who had been part of the unit acting unlawfully, rather than indiscriminately arresting everyone in the park was a key

11

factor in the Court's decision to grant the officers qualified immunity. Id.

Taking the facts in the case before me in the light most favorable to Plaintiff, Defendants failed to establish that they are entitled to qualified immunity for Plaintiff's unlawful seizure claims at this time. Plaintiff's allegations of what occurred at the Washington and Tucker intersection on September 17, 2017, do not establish that the officers in this case could reasonably have concluded the group at the intersection was acting as a unit or violating the law. The evidence shows no credible threat of force or violence to officers or property. There were no reports of property damage or violence after 8:30 p.m., and the scene at the intersection was relatively calm, although some people continued to engage in protest activity by voicing their displeasure with police.

First, Defendants fail to establish that it was objectively reasonably for them to believe the crowd a Washington and Tucker were acting as a unit. Defendants offer no evidence, aside from their general location to show the crowd was a single unit. Unlike the crowd in Bernini, which was marching and chanting in unison, the people near the intersection of Washington and Tucker were just milling about. Defs. Mem. Supp. Mot. J. Pleadings, ECF No. 72-1, p. 3. The crowd was not engaging in violence or disobedience. Defs. Mem. Supp. Mot. J. Pleadings, ECF No. 72, p. 3. In fact, the only reports of violence or property damage came hours before the mass arrest. Compl. Ex. 6 Ahmad Tr. Vol. 2, ECF No. 32-6, p. 134-35,

223. Additionally, the crowd did not arrive to the area at the same time or as a single unit and Defendants freely allowed ingress into the area, even after initial dispersal orders were given. Compl. Ex. 6 Ahmad Tr. Vol. 2, ECF No. 32-6, p. 74-75, Compl. at ¶ 141. Defendants then arrested everyone in the intersection, including those who were allowed to enter the intersection after the dispersal orders were issued. Defendants' failure to determine which members of the crowd were part of the unit acting unlawfully undermines their argument that arguable probable cause existed. See Bernini, 665 F.3d at 1004, cf Barham v. Ramsay, 434 F.3d 565 (D.C. Cir. 2006).

In addition to failing to establish that it was objectively reasonable to believe the crowd at the intersection of Washington and Tucker was acting as a unit, Defendants failed to establish that the crowd was violating the law. Defendants identify several statutes and ordinances relating to impeding traffic, unlawful assembly, and peace disturbance generally that they argue they could have reasonably believed the crowd violated, including Mo. Rev. Stat. §§574.010, 574.040, 574.060, and St. Louis City  Ordinances 15.52.010 and 17.16.275.

First, Mo. Rev. Stat. § 574.040, requires that the group act in concert, State v. Mast, 713 S.W.2d 601 (Mo. Ct. App. 1986), which the defendants failed to establish. Additionally, Mo. Rev. Stat. §§ 574.040 and 574.060, require that the individuals being arrested know the assembly has been declared unlawful and that

13

they willfully refuse to disperse or disassociate themselves from the group. Mo. Rev. Stat. §§ 574.040, 574.060, <u>White v. Jackson,</u> 865 F.3d 1064, 1075 (8th Cir. 2017). But in this case, there are significant factual disputes regarding the nature, quantity, and timing of dispersal orders given to the crowd. Compl. Ex. 6 Ahmad Tr. Vol. 2, ECF No. 32-6, p. 22-25, 71, 125-28, Compl. ¶ 142. Additionally, defendants allowed individuals to enter the area after the assembly was declared unlawful without notifying individuals that dispersal orders had been given. Compl. Ex. 6 Ahmad Tr. Vol. 2, ECF No. 32-6, p. 74-75, Compl. at ¶ 141. Given these disputes over the facts surrounding the dispersal orders, defendants cannot establish that they had arguable probable cause to mass arrest the crowd at Washington and Tucker.

Defendants also cited to Mo. Rev. Stat. § 574.010, which regulates peace disturbances. Defendants do not point to which provision of the statute is relevant, but I assume they are referring to §574.010(2), which states "a person commits the offence of peace disturbance if he or she: (2) is in a public place…and purposely causes inconvenience to another person or persons by unreasonably and physically obstructing: (a) vehicular or pedestrian traffic; or (b) the free ingress or egress to or from a public or private place." Mo. Rev. Stat. § 575.010(2). "In the protest context, the Supreme Court has already well articulated the contours of the right and made clear that the police may not interfere with demonstrations unless there is

14

a 'clear and present danger" of riot, imminent violence, interference with traffic or other immediate threat to public safety.' Jones v. Parmley, 465 F.3d 46, 57 (2nd Cir. 2006) (citing Cantwell v. Connecticut, 310 U.S. 296, 308–309 (1940)). "Neither energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest." Jones v. Parmley, 465 F.3d 46, 58 (2nd Cir. 2006) (citing Cox v. Louisiana, 379 U.S. 536, 546–47, 549 n. 12 (1965)). Although some of the people at the intersection of Washington and Tucker were in the street, it is unclear if they were purposely obstructing traffic or if their presence was merely slowing traffic and inconveniencing pedestrians. These questions are particularly poignant given the fact that protests are often allowed to occur in the streets and had been occurring in the streets of downtown St. Louis throughout the day in question. Given the First Amendment protections enjoyed by protesters, the police could not simply disperse or arrest them without fair warning. Parmley, 465 F.3d 46, 60 (2nd Cir. 2006) (citing City of Chicago v. Morales, 527 U.S. 41, 58 (1999), Feiner v. New York, 340 U.S. 315, 321 (1940)). The factual disputes surrounding the adequacy of the dispersal warnings, thus preclude the Defendants' claim for qualified immunity at this time.

Defendants also cite to Burbridge v. City of St. Louis, 430 F.Supp.3d 595 (E.D. Mo. Dec. 2019) (Clark, J.), which arose out of the same incident and held

15

that the defendants were entitled to qualified immunity on a claim of unlawful arrest. For the reasons explained below, I respectfully decline to follow that opinion.

First, Burbridge was decided at the summary judgement phase and thus benefited from additional factual development that has yet to occur in this case. Secondly, the city ordinances used to establish probable cause in <u>Burbridge</u> require either that the group act in concert to violate the law or require a violation of a dispersal order.[5] Defendants have not established that the group was acting in concert.  Additionally, the facts surrounding the dispersal orders are disputed and not sufficient at this juncture to establish probable cause.  Therefore, Defendants motion for judgment on the pleadings as to the Plaintiffs unlawful seizure claims will be denied.

---

[5] St. Louis City Ordinance 15.52.010 provides:
> Any two persons who shall, in this City, assemble together, or, being assembled, shall act in concert to do any unlawful act with force or violence, against the property of this City, or the person or property of another, or against the peace or to the terror of others, and shall make any movement or preparation therefor, and every person present at such meeting or assembly, who shall not endeavor to prevent the commission or perpetration of such unlawful act, shall be guilty of a misdemeanor.

St. Louis City Ordinance 17.16.275 provides in relevant part:
> A. No person, or persons congregating with another or others, shall stand or otherwise position himself or herself in any public place in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic.
> ...
> E. No person who has committed an act or acts within the description of subsections (A) through (D) above, upon being given an order by a police officer, ... to disperse, clear, or otherwise move, shall fail or refuse to obey such order. Such failure or refusal shall constitute the separate offense of failure to obey a dispersing order by a police officer....

**B.     Count Twelve – Excessive Force**

In his complaint, Plaintiff alleges Defendants violated his Fourth Amendment right to be free from excessive force through their use of kettling, zip-cuffs, and pepper spray. Defendants argue they are entitled to qualified immunity for these acts because it was not clearly established that the use of pepper spray, tight handcuffing, and arm dragging constituted more than *de minimis* force, which is not a cognizable Fourth Amendment violation. Additionally, the supervisory defendants (Leyshock, Sachs, Boyher, Jemerson, Karnowski, and Rossomanno) argue that they are entitled to qualified immunity because they did not personally participate in any use of force against Plaintiff and to the extent any of the supervisory defendants personally witnessed any unreasonable force, it was reasonable for them to believe that officers were only using the necessary force to accomplish the arrest.

Courts use the reasonableness standard to analyze excessive force claims in the context of a Fourth Amendment. Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006). The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, 'the

17

test is whether the amount of force used was objectively reasonable under the particular circumstances.'" Id. (citing Littrell v. Franklin, 288 F.3d 578, 583 (8th Cir. 2004). "The determination whether the force used to effect a seizure was reasonable ultimately requires a case-specific balancing of ''the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.'" Chambers v. Pennycook, 641 F.3d. 898, 905-06 (8th Cir. 2011) (Graham v. Connor, 490 U.S. 386, 396–97 (1989)). Relevant considerations include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (1989).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." Id. (internal quotation marks and citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97. "[F]orce is least justified against nonviolent misdemeanants who do not flee or

actively resist arrest and pose little or no threat to the security of the officers or the public." <u>Brown</u>, 574 F.3d at 499. "The use of any force by officers simply because a suspect is argumentative, contentious, or vituperative is not to be condoned." <u>Bauer v. Norris</u>, 713 F.2d 408, 412 (8th Cir. 1983) (internal quotation marks and citation omitted). "[T]he use of . . . gratuitous force against a suspect who is handcuffed, not resisting, and fully subdued is objectively unreasonable under the Fourth Amendment." <u>Krout v. Goemmer</u>, 583 F.3d 557, 566 (8th Cir. 2009).

Viewing the facts in the light most favorable to the Plaintiff, the deployment of pepper spray against him was not objectively reasonable. When Baude was pepper sprayed, he was not fleeing or resisting arrest in any way. And there is no indication Baude posed an immediate threat to the officers' safety. Additionally, the alleged crime he was being detained for was a non-violent misdemeanor. <u>See</u> <u>Brown</u>, 574 F.3d at 499. Even if Baude's queries directed at the officers who were attempting to effectuate arrest were argumentative, they did not amount to resisting arrest; "the use of any force by officers simply because a suspect is argumentative…is not to be condoned." <u>Bauer</u>, 713 F.2d at 412.

Even though the supervisory defendants did not personally use pepper spray against Plaintiff, they may still be liable.  Supervisors can be held liable under §1983 "(1) if the supervisor directly participated in the constitutional violation; (2) if the supervisor failed or refused to intervene when a constitutional violation took

19

place in his presence; (3) if the supervisor's failure to train or supervise the employee caused the constitutional violation;  or (4) if the supervisor created a policy or custom under which the constitutional violation occurred." B.J.G. ex rel. McCray v. St. Charles City Sheriff, No. 4:08-CV-1178-CDP, 2010 WL 1838414, at *3 (E.D. Mo May 6, 2010) (citations omitted), aff'd sub nom. B.J.G. ex rel McCray v. St. Charles City Sheriff, 400 F. App'x 127 (8th. Cir. 2010); also  Lansdown v. Chadwick, 152 F.Supp.2d 1128, 1146 W.D.Ark.2000);  Webster v. Gibson, 913 F.2d 510, 514 (8th Cir.1990) (direct participation); Putman v. Gerloff, 639 F.2d 415, 423 (8th Cir.1981) (failure to intervene); Tilson v. Forrest City Police Dep't., 28 F.3d 802, 806 (8th Cir.1994) (failure to train or supervise);  Whisman Through Whisman v. Rinehart, 119 F.3d 1303, 1311 (8th Cir. 1997) (policy or custom).

At this stage of the litigation, Plaintiff need only allege facts sufficient to state a plausible claim for liability. Plaintiff alleges Defendants were at the site of the mass arrest and witnessed officers in their command using excessive force but failed to intervene. He also alleges the supervisory defendants issued the orders allowing the use of force against the crowd, which was not violent, largely compliant, and unable to flee because of the use of kettling. These allegations are sufficient at this stage to state a claim that Defendants violated Plaintiff's right to be free from excessive force.

But the inquiry does not end there, to overcome qualified immunity, Plaintiff must present facts to show not only (1) that the officer[s'] conduct violated a constitutional right, but also (2) that the right was clearly established at the time  of the alleged violation. <u>Pearson</u>, 555 U.S. at 232. In May 2017, the Eighth Circuit established in <u>Tatum v. Robinson</u>, that it is unreasonable to use pepper spray on a non-resisting, non-fleeing individual, suspected of a non-violent misdemeanor.[6] <u>Tatum v. Robinson</u>, 858 F.3d 544, 548-550 (8th Cir. 2017). Even though Tatum was actively arguing with the officer when the officer deployed his pepper spray, the Eighth Circuit held that the use of pepper spray was unreasonable. The Court emphasized that "even when officers are justified in using some force, they violate [the] suspects' Fourth Amendment rights if they use unreasonable amounts of force." <u>Id.</u> at 550. In <u>Johnson v. Carroll</u>, the Eighth Circuit found that it was clearly established that "it was unlawful to throw to the ground and mace a nonviolent, suspected misdemeanant who was not fleeing or herself resisting arrest, who posed little or no threat to anyone's safety, [and] who never received verbal commands to remove herself…." <u>Johnson v. Carroll</u>, 658 F.3d 819, 828 (8th Cir. 2011). Additionally, it is clearly established that an officer can be held liable for failure to intervene or prevent the use of excessive force. <u>Nance v. Simmons</u>, 586 F.3d 604,

---

[6] Ultimately the Eighth Circuit granted the officer in <u>Tatum</u> qualified immunity because the plaintiff's right was not clearly established at the time. <u>Tatum</u> at 551. After <u>Tatum,</u> however, a reasonable officer would know that pepper spaying a non-fleeing, non-resisting individual suspected or held for non-violent misdemeanors is unreasonable.

611 (8th Cir. 2009).  Taken together these cases show that Baude's right to be free from excessive force was clearly established.

The parties dedicate significant time to discussing whether some minimum level of injury is required to establish a Fourth Amendment violation. Defendants argue that the uncertainty surrounding this issue entitles them to qualified immunity and cite to Robinson v. Hawkins to illustrate the uncertainty. This argument is unavailing.  It is clearly established that the unreasonableness of the force used, not the nature of the injury is the relevant inquiry. Chambers, 641 F.3d at 906. Robinson v. Hawkins does not undermine this point. The majority and dissenting opinions that address the excessive force issue both emphasize that a *de minimis* injury does not preclude a claim of excessive force but may be used as evidence that the force used was reasonable. Robinson v. Hawkins, 937 F.3d 1128, 1136 & 1140 (8th Cir. 2019).  Additionally, the disparity between the majority and dissent in Robinson turns on different interpretations of the specific facts presented in that case, which are not relevant here. Accordingly, Defendants are not presently entitled to qualified immunity on the excessive force claim.

## C.    Count Three – Civil Conspiracy

 In order to state a claim for conspiracy under 42 U.S.C. § 1983, the "plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in

22

an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008) (internal citation omitted). The first element "requires allegations of specific facts tending to show 'meeting of the minds' among the alleged conspirators." Murray v. Lene, 595 F.3d 868, 870 (8th Cir. 2010).

Defendants argue that they are entitled to qualified immunity on the 42 U.S.C. § 1983 conspiracy claim because the law on the intracorporate conspiracy doctrine is not clearly established as it applies to § 1983 claims. The intracorporate conspiracy doctrine "allows corporate agents acting within the scope of their employment to be shielded from constituting a conspiracy under § 1985." Meyers v. Starke, 420 F.3d. 738, 742 (8th Cir 2005).  The rule derives from the nature of conspiracy, which requires an agreement between or among two or more separate persons. Abbasi, 137 S.Ct. 1843, 1867 (2017). When two agents of the same legal entity make an agreement in the course of their official duties, as a practical and legal matter their acts are attributed to their principal, so it follows that there has not been an agreement between two or more separate people. Id. at 1867-68.

Defendants rely on Ziglar v. Abbasi, which held that officials were entitled to qualified immunity on §1985 conspiracy claims because the lower courts were divided on the applicability of the intracorporate conspiracy doctrine in § 1985 cases. Ziglar v. Abbasi, 137 S.Ct. 1843, (2017). Plaintiff argues that the

23

intracorporate conspiracy doctrine does not apply to § 1983 claims and that

Abbasi, which discussed § 1985 liability, is inapplicable here. Additionally,

Plaintiff argues that his rights to be free from unreasonable seizure and excessive

force were clearly established.

There is some debate whether the intercorporate conspiracy doctrine should

be applied in civil rights cases, particularly under §1983, where the acts of a

municipal employee are not attributable to the municipality itself.  But the Eighth

Circuit has already extended the doctrine to §1985 claims.[7] Powers v. City of

Ferguson, 229 F.Supp.3d 894, 905 (E.D. Mo 2017). And Sections 1983 and 1985

are close analogues that both trace their origins to the Civil Rights Act of 1871.

Griffin v. Breckenridge, 403 U.S. 88, 98-99 (1971).  Additionally, other circuits

have extended the intracorporate conspiracy doctrine to § 1983 claims. See

Jackson v. City of Cleveland, 925 F.3d 793, 819-20 (6th Cir. 2019), Grider v. City

of Auburn, Ala, 618 F.3d 1240, 1261-62 (11th Cir. 2010). Although Judges in this

district have declined to extend the doctrine to § 1983 cases in the absence of clear

direction from the Eighth Circuit, none have explicitly addressed its validity.

Aldridge v. City of St. Louis, MO, No. 4:18-CV-1677-CAS, 2019 WL 1695982 at

*8 (E.D.MO. April 17, 2019); Laird v. City of St. Louis, MO, No. 4:18-CV-1567-

---

[7] The parties did not point me to any Eighth Circuit cases addressing the application of the intracorporate conspiracy doctrine in §1983 conspiracy claims, nor has my search uncovered any such cases.

AGF, 2019 WL 2647273 at *5 (E.D.MO June 27, 2019); <u>Powers</u>, 229 F.Supp.3d

at 906;  <u>Anzaldua v. Northeast Ambulance and Fire Protection District</u>, 2014 WL

466234, at *8 (E.D. Mo. 2015) ; <u>Golden v. Moutray</u>, 2018 WL 1784395, at *4

(E.D. Mo. 2018).

In light of this landscape, it cannot be said that the law regarding the

application of the intracorporate conspiracy doctrine in § 1983 cases is clearly

established. In <u>Abbasi</u> the Court held that officials were entitled to qualified

immunity because the law regarding the applicability of the intracorporate

conspiracy doctrine to § 1985(3) claims was not well established. According to the

Court, "when the courts are divided on an issue so central to the cause of action

alleged, a reasonable official lacks the notice required before imposing liability."

<u>Id.</u> at 1868. As in <u>Abbasi</u>, the key issue in this case is whether the officers could

reasonably have known that the agreements entered into or the agreed-upon tactics

devised with other officers of the SLMPD could subject them to conspiracy

liability. Given the uncertainty regarding the applicability of the intracorporate

conspiracy doctrine in § 1983 cases, the officers could not have reasonably known

their actions would open them up to liability for a conspiracy.  Therefore,

Defendants are entitled to qualified immunity and I will grant their motion for

judgment on the pleadings as to Count III.

## CONCLUSION

For the reasons explained above, Defendants' Motion for Judgment on the Pleadings will be granted as to Count III. The motion will be denied as to Counts I, II, and XII.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Judgment on the Pleadings, ECF No. [72] is **GRANTED** as to count III, but in all other respects is **DENIED**.


_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 4th day of August, 2020.